**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA KING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11 C 2842** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN, Commissioner** | ) | |
| of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Sandra King seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. Act, 42 U.S.C. § 1382c(a)(3)(A). Ms. King asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. King applied for SSI on March 11, 2008, alleging that she had become disabled on March 31, 2005. (Administrative Record ("R.") 177-79). Her application was denied initially and upon reconsideration. (R. 112-121). Ms. King continued pursuit of her claim by filing a timely request for a hearing.

An administrative law judge ("ALJ") convened a hearing on March 16, 2010, at which Ms. King, represented by counsel, appeared and testified. (R. 39-111). In addition, Dr. Hugh Savage and Dr. Elise Torczynski testified as medical experts, and Melissa Benjamin testified as a vocational expert. (R. 39). On April 12, 2010, the ALJ issued a decision finding that Ms. King was not

disabled because she retained the capacity to perform light work that exists in significant numbers in the national economy. (R. 20-38). This became the final decision of the Commissioner when the Appeals Council denied Ms. King's request for review of the decision on March 4, 2011. (R. 2-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. King has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. King was born on December 17, 1957, making her fifty-two years old at the time of the ALJ's decision. (R. 177). She quit school after just the ninth grade. (R. 44). She then had her first child at age fifteen. (R. 61). Ms. King has almost no experience with the working world. In the last 28 years, she has worked a total of nine months. (R. 188, 199). That work was babysitting her grandchildren, which was apparently part of a program in which she was paid by the State of Illinois. (R. 199). She used to smoke crack, but had not done so for a year or two before her administrative hearing – about the time she filed her application for SSI. (R. 60). In her SSI application, Ms. King said she had never been married. (R. 177).

### B.
### The Medical Evidence

The medical record reveals that Ms. King has a prosthetic right eye and a vision impairment in her left eye that can be easily corrected with glasses or a contact lens. She has asthma, which is stable and under control. She also has calluses on her feet which were severe enough to require treatment on one occasion. Finally, she has osteoarthritis in her neck and suffered some mild to

2

moderate pain in her right arm for a brief period in September 2009.

On September 24, 2007, Ms. King sought treatment at the St. Bernard Hospital emergency room for general aches and nausea. She was noted to have a prosthetic right eye and normal left eye. (R. 376). She admitted to smoking a half-pack of cigarettes a day and using cocaine on a regular basis. (R. 376). A drug screen was positive for both cocaine and cannabis. (R. 376). A chest x-ray was consistent with pneumonia (R. 376), and a spinal x-ray revealed dextroscoliosis (curvature of spine to the right) and minimal degenerative spondylosis. (R. 375). Extremities and neurological examination were normal. (R. 377). Ms. King was treated for five days and discharged in stable condition. (R. 376).

On January 11, 2008, Ms. King went to the South Shore Hospital emergency room complaining of right arm and neck pain, (R. 345), which had begun a week earlier. (R. 346). Respiration and breath sounds were normal, and she had no complaints in that area. (R. 346, 352). Ms. King claimed to be a nonsmoker. (R. 347). Sensory and motor exam of her right arm were normal, but range of motion was limited by pain. (R. 347). After a couple of hours, Ms. King said her pain had subsided and asked to be discharged. (R. 348-49). Ms. King sought podiatry treatment at Provident Hospital on March 11, 2008. (R. 357). The treatment note is illegible.

The disability agency arranged a consultative examination for Ms. King with Dr. Norma Villanueva on April 14, 2008. Dr. Villanueva noted that Ms. King had an artificial right eye, and had gone to a podiatrist to have her calluses trimmed. She had been to emergency rooms for treatment of her asthma and recently was given medication for pneumonia. (R. 308). She took Levaquin (for pneumonia or bronchitis), acetaminophen, and used an Albuterol inhaler when needed. (R. 309). Ms. King admitted to smoking 3 cigarettes a day. (R. 309). She exhibited

decreased breath sound and wheezing and rhonchi.  Respiratory rate was normal.  (R. 309).  The doctor noted that Ms. King did have tender calluses on both feet, but gait was normal.  (R. 309).  While she was unable to heel/toe walk due to pain, she had no trouble with tandem gaiting and squatting.  (R. 309).  Her range of motion and grip strength were normal (R. 309).  Sensation, reflexes, and strength were all normal throughout.  (R. 309).  Vison in Ms. King's left eye was 20/50 uncorrected and 20/40 with pinhole correction.  (R. 313).

Ms. King also had a consultative psychiatric evaluation with Dr. Helen Radomska that same day.  (R. 317).  She noted that Ms. King's grooming and hygiene were fair and that she had no abnormality of gait.  (R. 317).  Ms. King said she had been depressed and had been treated with medication. She said she still had a lot of things on her mind.  She didn't sleep well at night but did not take naps during the day.  (R. 317).  Ms. King allowed that she drank forty ounces of beer a day and used to smoke marijuana as a teenager.  She claimed to have used cocaine just once, on her last birthday.  (R. 318).  Dr. Radomska found Ms. King to be in a depressed mood.  Her thought process was liner and goal directed, she had no hallucinations, and was not delusional.  Judgment and memory were not good.  She could not perform serial sevens or threes.  (R. 319-20).  Dr. Radomska diagnosed major depressive disorder and assigned Ms. King a GAF score of 40 to 45.  (R. 320).

Ms. King was treated for pneumonia at the ACHN clinic in March 2008.  She was given Levaquin and after a week was feeling much better.  (R. 421).  Her asthma was stable and she was referred for smoking cessation counseling.  (R. 421). On April 25, 2008, Dr. Ernst Bone reviewed the medical evidence in Ms. King's file.  (R. 342).  He felt she was capable of performing medium work.  (R. 336).  On May 11, 2008, J.Gange reviewed the psychiatric evidence (R. 321), and found that Ms. King's depression left her markedly limited in her daily activities, social functioning, and

ability to concentrate.  (R. 331).[1]

On May 19, 2008, Ms. King sought treatment for lower back pain at the emergency room of South Shore Hospital in Chicago.  (R. 344).  She was noted to have Illinois Medicaid insurance. (R. 344).   At the end of June 2008, two more agency physicians reviewed the medical file and concurred I the earlier finding that Ms. King could perform medium work.  (R. 361).

Ms. King went to the neighborhood health clinic at Mt. Sinai Hospital on September 29, 2008, inquiring about lab results and asking for a prescription for her asthma and that they fill out her form to get disability benefits.  (R. 365).  She was anemic and had lost about 20 pounds.  (R. 366, 368).  On November 6, 2008, Ms. King sought treatment at the neighborhood clinic for left eye trauma and foot ulcers.  (R. 362-63).  She was given prescriptions for Benadryl, Motrin, and Robitussin.  (R. 364).

On November 13, 2008, Ms. King returned to the South Shore Hospital emergency room explaining that her grandson hit her in the eye with a stick because she took bread from him.  (R. 497).  She suffered a fracture of the medial wall of her left eye socket, and the lens in her left eye appeared to be subluxed.  There was hematoma and swelling.  (R. 501).   Vision exam at the time revealed she could count fingers at eight feet (R. 502), which indicates a visual acuity equivalent to 20/1000.  http://www.mdsupport.org/library/acuity.html.

On April 10, 2009, Ms. King sought prescription refills at the emergency room of Provident

_____

[1] Ms. King's psychological condition is not a factor in her pursuit of SSI.  The two records pertaining to depression are not referenced in Ms. King's brief and her psychological condition is not even mentioned in her submissions.  The evidence plays no role in her action to overturn the ALJ's decision.  Consequently, any argument she may have had regarding this impairment is waived. *Blevins v. Astrue*, 451 Fed.Appx. 583, 585 (7th Cir. 2011); *Fleming v. Astrue*, 448 Fed.Appx. 631, 633 (7th Cir. 2011); *Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir.2004).

Hospital. (R. 429-31). She denied any drug or alcohol use, but admitted to smoking 3-4 cigarettes a day. (R. 431). She denied any pain or discomfort. (R. 432). She had a laceration to her left cheek treated and sutured at South Shore Hospital on May 25, 2009. (R. 460-71). A CT scan of her cervical spine revealed minimal osteoarthritic changes at C4-5, C5-6, and C6-7. Spinal canal was maintained. There was a small radiolucency in the right lamina of T2. (R. 475). She was noted to have a dislocated lens in her left eye. (R. 474).

She returned to South Shore Hospital emergency room on September 30, 2009, complaining of mild to moderate right arm pain, headache and neck pain. (R. 445, 450). She admitted to a history of smoking and drug use. (R. 445). Range of motion in her neck was full and painless. (R. 446). There was right arm pain upon range of motion examination. (R. 446). A CT scan revealed osteoarthritic changes in the cervical spine with disc space narrowing at C4-5, C5-6, and C6-7. (R. 454). On December 10, 2009, Ms. King went to South Shore Hospital's emergency room complaining of right shoulder pain. She asked for pain medications. (R. 437-38). Examination of her extremities revealed a full range of motion and no tenderness; specifically, she had a good range of motion in her right arm and shoulder. (R. 439, 442). Her gait was noted to be steady. (R. 443)

On December 31, 2009, Ms. King went to the Englewood Health Center complaining of right leg pain and asking to have her disability papers filled out. (R. 419). She needed her ibuprofen and asthma pump refilled. (R. 419). She was also having trouble seeing out of her left eye. (R. 420). She was given referral for a foot doctor and an eye exam. (R. 420). On January 26, 2010, Ms. King went to the Englewood Health Center complaining of right side and back pain and requesting a refill of Advil and Albuterol. (R. 418).

On November 20, 2010, Dr. Isabel filled out a form Ms. King's lawyer provided regarding

Ms. King's condition. The doctor said she had seen Ms. King "yearly" but did not indicate for how long. Ms. King was blind in her right eye, her left eye was injured, and she had arthritis in her right arm. This resulted in right shoulder pain that was achy to sharp. The pupil in her left eye was damaged. The doctor said that Ms. King was receiving no treatment for her impairments. Ms. King also had depression and anxiety. (R. 401). Ms. King's pain or other symptoms were never severe enough to interfere with her concentration. (R. 402). Yet, her impairments prevented her from walking more than ½ block, sitting for more than 5 minutes, or standing for more than ten minutes. In an entire workday, Ms. King could sit for a total of 2 hours and stand or walk for a total of two hours. (R. 402). Still, the doctor felt that Ms. King did not have to change positions at will. (R. 402). She needed a cane to walk and could not lift anything. (R. 403). Ms. King could only use her right arm, hands and fingers to do things like reach, grasp, or manipulate objects 5% of an eight-hour workday. She could only use her right arm, hands, and fingers 2% of a workday. (R. 403). She was unable to read well enough to perform any type of work. (R. 403)

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

Ms. King testified that she was 52 years old and dropped out of school after ninth grade. (R. 44). She has 19 grand children and 2 great grand children. (R. 45). She lives with her oldest daughter and her eight children. (R. 63). Ms. King testified that she got married when she was sixteen (R. 57), but this contradicts her application for benefits in which she averred she had never been married. (R. 177). She knows how to read and write, but had trouble doing so physically due to her eye condition. (R. 44). She has never worked other than babysitting her grandchildren and

getting paid for that by the State of Illinois. (R. 46). Ms. King explained that she lost her right eye at age 3 and has worn a prosthetic. (R. 47). She said she injured her left eye in November of 2008 when her grandson hit her with a pole and knocked the lens loose. (R. 48, 51). She it was an accident. (R. 48). Consequently, Ms. King didn't go out alone; she had someone accompany her to her hearing on the bus. (R. 50). She was scheduled to have a lens implant in April of 2010. (R. 52).

Ms. King also complained about her asthma. She said she got short of breath climbing stairs and her legs hurt. (R. 53). She also got pain from her right arm up to her neck. (R. 53). She takes pain medication to relieve it. (R. 53). She couldn't even carry a grocery bag. (R. It was mainly her eye, however, that limited what she could do around the house. (R. 54). She didn't cook, because she would burn herself. (R. 54). Ms. King said she had really bad feet from when she had a corn removed. (R. 54). She could stand for about an hour before she had to sit down. (R. 55). In addition, her memory was weak. (R. 56).

Ms. King formerly had a problem with alcohol addiction, but hadn't abused alcohol for a year before the hearing, aside from a shot on her niece's birthday. (R. 56-57). She also formerly smoked crack, but had gone about two years with doing that. (R. 57). She also had experienced depression and treated with a psychiatrist at a clinic, who put her on Xanax. (R. 74-75). Ms. King said they made her like a zombie. She took them all, had to have her stomach pumped, and she never took them again. (R. 75).

In a typical day, she would watch soap operas. (R. 61). She had to sit very close to the TV. (R. 61). She even stayed up all night watching TV, and would nap during the day. (R. 62). She didn't do much around the house at all; her grandchildren took care of her.

## The Medical Experts' Testimony

Dr. Torczynski testified regarding Ms. King's vision problems. She explained that Ms. King had been monocular since the age of three when she lost her right eye. (R. 76). Regarding the injury to her left eye, the doctor noted there was only one exam in the record which indicated she had a dislocated lens. (R. 76). There were three options for treatment: spectacles, contact lenses, or a lens implant. (R. 76). Her vison would be 20/70 or better. (R. 78). When asked why she didn't get glasses or other treatment, Ms. King said she didn't have medical when the injury occurred and they wanted money. (R. 80). When she found that out, she didn't return. (R. 80). But then she went to another doctor and asked for a referral to Stroger Hospital for free treatment. (R. 80).

Dr. Torczynski said that, with correction, Ms. King could work but not around heights, dangerous machinery, or fumes. (R. 83). She would not meet the listings for vision impairments. (R. 84). Dr. Torczynski seemed perplexed that Ms. King took so long to ask for a referral. (R. 80).

Dr. Savage then discussed the medical evidence concerning Ms. King's other ailments. He said her asthma was only a borderline obstruction and did not meet a listing. (R. 93). This was exacerbated by smoking. (R. 93). Based on the medical evidence, coupled with Ms. King's testimony, the doctor felt Ms. King could do light work. (R. 93-94). Dr. Savage noted that Ms. King rarely followed up for recommended treatment of her impairments – other than her asthma. (R. 93-95, 103-04). As such, he questioned whether her other impairments were really a problem. (R. 103-04). Ms. King claimed that she didn't know where to go. (R. 96). Dr. Savage pointed out that she had no problems going for treatment when her asthma acted up. (R. 104). The doctor did not consider that lack of insurance or funds was a valid reason for not seeking treating, because she was aware she could get free treatment at emergency rooms as she had done in the past with her

asthma.  (R. 106).

As for Ms. King's arthritis, Dr. Savage explained that she was on very minimal medication, nothing more than ibuprofen, sporadically.  (R. 101).  She took no pain medication.  (R. 101).  He didn't think the most recent x-ray evidence of the cervical spine proved radiculopathy or nerve root involvement.  An MRI would be required for that.  (R. 104-05).

### 3.
### The Vocational Expert's Testimony

Finally, Ms. Benjamin testified as a vocational expert.  She testified that a person who had the capacity to sit, stand, and walk frequently, lift 10 pounds frequently and 20 pounds occasionally, and maintain concentration, persistence, and pace with a mild limitation, but could not work at heights or around dangerous machinery, could perform unskilled, light work.  (R. 108).  She cited examples of jobs that would fall under this category and existed in significant numbers in the regional economy: hostess, locker room attendant, and information clerk.  (R. 107-08).  Monovision would not preclude the same individual working at these jobs.  (R. 108).

If the same person were off task for more than 15% of the time, they would be terminated.  (R. 109).  The same would hold true for being absent an average of 1.75 days per month.  (R. 110).

### D.
### The ALJ's Decision

The ALJ found that Ms. King suffered from the following severe impairments: monovison, calluses on her feet, asthma, and osteoarthritis.  (R. 25).  The ALJ next determined that she did not have an impairment or combination of impairments that met or equaled a listed impairment.  (R. 20).  He specifically found that her depression did not meet or equal the criteria for ophthalmological listing 2.02, 2.03, or 2.04.  (R. 25).  He referenced the testimony of the medical expert that Ms.

King's vision did not meet or equal a listing. (R. 25). The ALJ then considered the medical evidence and the expert testimony concerning Ms. King's feet and found she did not meet the listing covering lesions on the soles of the feet. (R. 26). She did not have chronic asthma under listing 3.03, or osteoarthritis to the degree required by the listings pertaining to that impairment. (R. 26). Finally, the ALJ determined that Ms. King's depression was only mild and, therefore, not severe. She had only mild limitations in concentration, persistence, and pace. (R. 27).

The ALJ went on to determine that Ms. King had the residual functional capacity to perform light work, except that she could not work around heights or dangerous machinery and had a mild limitation in maintaining concentration, persistence, and pace. (R. 27). Here, the ALJ summarized the medical evidence at length. (R. 28-32). Along the way, he noted that the state agency physician felt Ms. King could perform medium work, but felt the testimony of the medical expert that she could only perform light work was more convincing. (R. 28).

He found that Ms. King's allegations were not fully credible. (R. 30). She complained of poor vison in her remaining eye, but had not pursued the three options available to her for correction. (R. 30). Similarly, Ms. King had failed to follow up with foot treatments. (R. 30). She previously lied about her cocaine use to the psychiatrist who treated her for depression. (R. 31). And, finally, the medical evidence did not support the extent of her complaints. (R. 31). The ALJ accepted the opinions of the two medical experts, Drs. Torczynski and Savage that Ms. King was capable of doing a limited range of light work. (R. 32). He rejected the dire assessment of Dr. Isabel, who essentially indicated that Ms. King could do nothing at all, because it was inconsistent with the medical evidence. (R. 32).

Finally, the ALJ relied on the vocational expert's testimony to determine that Ms. King could

perform work that existed in significant numbers in the regional economy and, therefore, found her

not disabled and not entitled to SSI under the Act. (R. 33).

**IV.**
**DISCUSSION**

**A.**
**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The

court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g).

Substantial evidence is such relevant evidence as a reasonable mind might accept to support a

conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402

U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that

of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where

conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled,

it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir.

2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to

such deference, however, so where the Commissioner commits an error of law, the court must

reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt

v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp"

for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is

required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v.

Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece

of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate

12

conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544.

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

13

**C.**
**Analysis**

Ms. Logan submits that there are three flaws in the ALJ's decision. First, she argues that the ALJ should have considered whether she was disabled for a closed period due to her vision impairment. Ms. King also argues that the ALJ improperly rejected the opinion of her treating physician. Finally, she complains that the ALJ improperly analyzed the severity of her feet and osteoarthritis impairments and did not properly assess her credibility. And, credibility is the salient issue here and, really, the only one. Ms. King has, at best, a very casual acquaintance with the truth. As the foregoing record and testimony reveals, she was married at 16; she was never married. She smoked crack regularly; she smoked it once; she never smoked it. She smoked half a pack of cigarettes a day; she smoked 3-4 a day; she smoked one. Her grandson hit her in the eye with a stick accidentally; her grandson hit her intentionally when she took his bread. These are but a few examples. Ms. King has a problem wit the ALJ not believing her but, in the face of the evidence, that was the only rational decision he could have made. If anything, his assessment was too kind.

**1.**

Ms. King first argues that her vison impairment met the listings from the date of her eye injury in November 2008 until the date of the ALJ's decision. Accordingly, she feels she should have been entitled to a closed period of disability and SSI for that period. Her vision in her remaining eye was worse than listing 2.02's requirement of 20/200 or worse. For Ms. King, it makes no difference that she could have had the problem corrected. She claims she did not have medical insurance or money and that she did not know free treatment was available.

The ALJ explained why Ms. King was not entitled to a closed period of disability: treatment was available to correct the problem. This ranged from glasses to contact lenses to surgery. She had

14

a few options, but she didn't pursue them. If a plaintiff fails to follow a course of treatment that will restore her ability to work, a denial of benefits is appropriate unless there was good reason for the failure. 20 C.F.R. § 404.1530(a), (b); *Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir. 2000). One good reason might be an inability to afford the treatment, *Schauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), and that's what Ms. King is resting on here. The question in such an instance is whether the plaintiff had "access to free or low-cost medical services." SSR 96–7p, 1996 WL 374186, 8.

Ms. King argues that she didn't know that free treatment was available and, it seems as though she feels the ALJ had no choice but to believe her. He didn't believe her, and neither did the medical expert Dr. Savage.

As both the doctor and the ALJ suggested, if the medical record proves anything, it proves that Ms. King can access free treatment whenever she wanted to, just as could the plaintiff in *Lopez v. Astrue*, 807 F.Supp.2d 750 (N.D.Ill. 2011). There are well over two-hundred pages of records of medical treatment that Ms. King accessed for free through emergency rooms and local clinics. She clearly knew how to access the free health services available to her. *See Lopez, supra.* Indeed, with her history of enjoying free health care she seemed surprised that she had stumbled upon a facility – UIC Hospital – that actually expected payment in return for their services. She said, "they wanted money . . . So I didn't get a follow-up on that." (R. 80). Moreover, Ms. King has been able to gain access to food stamps and other programs for the indigent (R. 178), so the process is clearly not unknown to her. Surely, the ALJ was not required – as Ms. King seems to feel – to ignore reality. Indeed, the record even includes a notice to Ms. King from South Shore Hospital – that she signed – indicating that she could receive free treatment if she demonstrated an inability to pay. (R. 396).

Even if the ALJ believed Ms. King, it would not necessarily change the result. The fact is that Ms. King has not shown she had *no access* to free or low cost treatment. Even if one takes her at her word, she failed to even make the simplest inquiry about free vision care. She never bothered to ask anyone. That is a far cry from demonstrating she had no access to free vision care. And under applicable law, that's what she had to do. SSR 96–7p, 1996 WL 374186, 8.

Ms. King points to *Woolridge v. Barnhart*, 2004 WL 2066918 (N.D.Ill. 2004), where the court found that the ALJ improperly dismissed the plaintiff's explanation that he didn't know he could get free treatment. But in that case, there was no evidence of numerous visits to emergency rooms for free treatment. The excuse of ignorance of free treatment simply rings hollow in the face of a history of receiving treatment at emergency rooms and clinics without paying for it. Where that evidence exists ALJs are perfectly justified in rejecting claims of impecuniosity as the basis for not seeking treatment. *See Thorps v. Astrue*, 873 F.Supp.2d 995, 1006 (N.D.Ill. 2012); *Lopez v. Astrue*, 807 F.Supp.2d 750, 761 (N.D.Ill. 2011); *Brothers v. Astrue*, 2011 WL 2446323, 12 (N.D.Ill. 2011); *Castle v. Astrue*, 2010 WL 4931861, 8 (N.D.Ill. 2010). Moreover, according to Ms. King's testimony, she didn't even inquire about free glasses or other vision correction. That, too, strains credulity. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999)("Although [plaintiff] claims he could not afford such medication, there is no evidence to suggest that he sought any treatment offered to indigents . . . .").

With common sense stacked against her, Ms. King says she is still entitled to a remand on this point because the ALJ failed to adequately explore the reasons she did not seek free corrective measures treatment for her vision impairment. She cites cases like *Craft v. Astrue*, 539 F.3d 668 (7th

Cir. 2008) and *Defrancesco v. Bowen*, 867 F.2d 1040 (7th Cir. 1989), in which the ALJ failed to inquire why the claimant had not pursued treatment. That's not the case here, because the ALJ did inquire. It's not clear what more the ALJ ought to have asked Ms. King after she told him she didn't know about free healthcare and didn't follow up. Again, given the medical record, the ALJ understandably didn't believe her, and neither did the two medical experts. Ms. King offered her excuse, but it didn't jibe with her history of seeing and receiving free treatment. The ALJ had ample justification not to credit her explanation.

### 2.

We turn to Ms. Kings criticism of the ALJ's assessment of her credibility. She argues that the ALJ failed to adequately explain why he found portions of her testimony not credible and relied upon improper means to find her not credible. Given the record, the argument is not compelling.

An ALJ's credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir.2010); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000). Review of an ALJ's credibility determination is limited to examining whether the ALJ's determination was "reasoned and supported." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong and deserving of reversal." *Elder,* 529 F.3d at 413–14. And, while the ALJ must "build an accurate and logical bridge between the evidence and the result," the court must give the ALJ's opinion a commonsensical reading rather than nitpicking at it. *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir. 2010).

Here, the ALJ found Ms. King not credible for a number of valid and compelling reasons. For one, the expert testimony showed that her vison and foot problems could be easily treated. That's one valid reason for discounting Ms. King's testimony. S.S.R. 82–59, 1982 WL 31384, at *1; *Eakin v. Astrue*, 432 Fed.Appx. 607, 613 (7th Cir. 2011); *Craft v. Astrue,* 539 F.3d 668, 678–79 (7th Cir. 2008).

For another, the ALJ compared Ms. King's complaints to the objective medical evidence and found her to be exaggerating. That too is a valid reason and in the context of this case, a plainly warranted conclusion. Ms. King may have complained of pain on the very few occasions cited in her briefs, but the medical evidence demonstrates that it was not as severe as she claims.[2] For example, on January 11, 2008, Ms. King sought treatment for a sore neck, but the supposedly excruciating pain – she said it was 10.10 – resolved itself before a doctor even saw her. (R. 265-66). On other occasions, examination revealed normal range of motion, sensation, strength, and grip. Also in her brief, Ms. King claims that her feet are constantly in such pain that she must remain supine and when she walked, it was with a significant limp. (*Plaintiff's Brief*, at 9). But none of the evidence she cites, (R. 367, 382, 390, 417, 423, 425), says anything about needing to remain supine

---

[2] It should be noted that, throughout Ms. King's submissions, pages in the medical record are string-cited without regard to what dates the evidence is from. The effect it to suggest that Ms. King sought treatment for repeated instances of pain when, in fact, several pages refer to a single date because there are so many duplicate records in the file. For example, Ms. King's opening brief cites ten instances of complaints of neck and shoulder pain on page 11, but the string really only refers to three occasions, in January 2008, September 2009, and December 2009. One of the pages does not refer to neck or shoulder complaints at all, but right flank pain thought to have been brought on by excessive drinking of alcohol. (R. 381).

Similarly, there are several pages string-cited on page 14 of the brief that all refer to a single date. Also, several of the string-cited pages on page 9 refer to a single date or are release forms and not medical evidence at all. Hopefully, this was not done intentionally in an effort to mislead the court, but Ms. King's brief does refer to these occasions as occurring "frequently" or "consistent" (*Plaintiff's Brief*, at 11, 14), when in fact they were relatively rare. It would behoove counsel in the future to check the dates and content of the medical evidence he relies upon lest it be thought that such actions are deliberate.

or walking with a limp.  In fact, throughout the record Ms. King's gait is described as normal or steady.

Contrary to Ms. King's brief, ALJs are, of course,  free to rely on discrepancies between the objective evidence and self-reports to find that a claimant is exaggerating her symptoms.  *Schreiber v. Colvin*, 2013 WL 1224905, 9 (7th Cir. 2013); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Getch v. Astrue,* 539 F.3d 473, 483 (7th  Cir.2008); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir.2005).  The cases Ms. King cites do not suggest otherwise; those cases simply say that an ALJ may not *ignore* a claimant's complaints even if there is no medical evidence to support them.  *See, e.g., Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  The ALJ here clearly did not ignore Ms. King's allegations. He evaluated them, found them exaggerated, and limited Ms. King to less than a full range of light work.  He actually went further than he needed to.  *See, e.g., Pepper v. Colvin*, 2013 WL 1338123, 15 (7th Cir. 2013)(ALJ did not have to be specific about the claimant's exaggerated symptoms).

Finally, the ALJ made note of the fact that Ms. King had lied to doctors.  She lied about cocaine use, and she lied about what other doctors had told her.  As has already been noted, the ALJ could have gone further here, as there are several more examples of Ms. King lying.  She's not a particularly truthful person and, as result, she is not a particularly believable witness.  Of course, lies and inconsistent statements provide a valid basis for finding a witness not credible.  *Wurst v. Colvin*, 2013 WL 1501941, 2 (7th Cir. 2013); *Long-Gang Lin v. Holder*, 630 F.3d 536, 544 (7th Cir. 2010); *Hill v. Astrue*, 295 Fed.Appx. 77, 81 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).  Ms. King has fallen far short of demonstrating that the ALJ's credibility determination was "patently wrong."  Indeed, it seems patently right.

**3.**

That leaves the ALJ's treatment of Dr. Isabel's opinion that Ms. King was completely disabled. Ms. King feels that the ALJ did not provide adequate reasoning for rejecting this opinion. That's simply not the case.

A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(c)(2); *Schreiber v. Colvin*, 2013 WL 1224905, 6 (7th Cir. 2013); *Jelinek v. Astrue,* 662 F.3d 805, 811(7th Cir. 2011). But an ALJ is not required to blindly accept a treating physician's opinion; he can reject it, as long as he provides good reasons for doing so. *Schreiber*, 2013 WL 1224905; *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). An ALJ doesn't have to recite the considerations applicable to assessing a medical opinion chapter and verse; it is enough that he minimally articulates his reasons and they are supported in the record. *Henke v. Astrue*, 498 Fed.Appx. 636 (7th Cir. 2012); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.2008). Here, the ALJ rejected Dr. Isabel's opinion because it was inconsistent with the record and went against the opinions of the two medical experts. These are unquestionably valid reasons for rejecting a treating physician's opinion. *Schreiber*, 2013 WL 1224905, 6; *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). And the ALJ was right on both counts.

Both Dr. Savage and Dr. Torczynski found that Ms. King could work, and were struck by her lack of follow-up to treat aliments she claimed were dire. Also, Dr, Savage pointed out – quite accurately – that the record was simply not such that it supported any greater restrictions. And, as the ALJ stated, it does not. The vast majority of Ms. King's trips to emergency rooms or clinics are for refills of prescriptions for her inhaler and anti-inflammatory medication. Also, as the ALJ indicated, there is absolutely noting in the record to suggest that Ms. King is all but incapable of

using either of her arms.  Objective medical evidence revealed only minimal osteoarthritic changes in her right arm.  As for requiring a cane to walk, as the ALJ pointed out, Ms. King's gait was consistently found to be normal without the use of a cane.  There is nothing wrong with the ALJ's rejection of Dr. Isabel's opinion, nor with his rationale.  If anything, as with his treatment of Ms. King's credibility, the ALJ was kind. Aside from the flaws the ALJ noted, Dr. Isabel's opinion was, in certain instances, nonsensical.  For instance, if Ms. King could only sit for five minutes at a time and stand for ten, how can it be that she was not required to change positions at will?  If she is in such pain that she must, seemingly, recline for all but four hours a day, how is it that such pain has absolutely no effect on her concentration?

The real problem here is with the plaintiff's review of the evidence and of Dr. Isabel's opinion.  Contrary to the statements in Ms. King's briefs, there is absolutely no evidence of anything wrong with her *left* arm: she has never even sought treatment for it.  The citations to the record she claims support her contention that she can only use her left arm for 5% of the day – (R. 265, 346, 354, 440-42, 446, 452) (*Plaintiff's Reply Brief*, at 6) – all refer solely to Ms. King's complaints about her *right* arm.  Moreover, on most of those occasions, she had normal range of motion, strength, sensation, etc.  Also, contrary to Ms. King's briefs, there is no diagnosis of cervical radiculopathy in the record.   The "diagnosis" cited to in those submissions is a "provisional" one (R. 452), which was not borne out by the CT scan demonstrating minimal changes and no problems in the spinal canal.  (R. 474-75).  Also, Ms. King's brief suggests that Dr. Isabel has some great, longitudinal familiarity with Ms. King.  (*Plaintiff's Brief*, at 11 ("Dr. Isabel had treated Plaintiff over a period of years, having seen her multiple times. . . . "); *Plaintiff's Reply*, at 6 ("Dr. Isabel's opinion was based on a treatment of Ms. King over a period of years, including multiple examinations . . .

.")).   But the evidence cited in the opening brief claimed to support that assertion shows that Dr. Isabel has seen Ms. King *only twice*.  (R. 252, 401-03).   The notes cited in Ms. King's brief in support of Dr. Isabel's familiarity with Ms. King's case are all from other physicians.  (*Plaintiff's Reply*, at 6 (citing R. 263-65, 284, 354, 366, 381, 437, 444-45)).   In fact, there do not appear to be any treatment notes from Dr. Isabel whatsoever in the record.

Courts are entitled to better than what appears in the plaintiff's briefs.  A more careful and faithful reading of the record would save all the trouble of responding and disposing of arguments that are supported only by mischaracterizations of the evidence.  Appeals from denials of Social Security disability benefits are not exempt from the rules requiring that lawyers on both sides of the case owe a duty of candor to the court.  *Cf. Nix v. Whiteside*,  475 U.S. 157, 169 (1986); *New York Cent. R. Co. v. Johnson*, 279 U.S. 310, 319 (1929); *Schmude v. Sheahan,* 420 F.3d 645, 651 (7th Cir.2005); *Beam v. IPCO Corp*.,  838 F.2d 242, 249 (7th Cir 1988).

**CONCLUSION**

The plaintiff's motion for summary judgment or remand [#24] is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 7/31/13